D/F

LAW OFFICES
# STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

425 PARK AVENUE
NEW YORK, NY 10022
www.stillmanfriedman.com

CHARLES A. STILLMAN
JULIAN W. FRIEDMAN
PAUL SHECHTMAN
SCOTT M. HIMES
MARJORIE J. PEERCE
JOHN B. HARRIS
JAMES A. MITCHELL
MICHAEL J. GRUDBERG
NATHANIEL Z. MARMUR

CAROLYN BARTH RENZIN
LARA SHALOV MEHRABAN
PEGGY M. CROSS
EDWARD J. JOYCE
MARY MARGULIS-OHNUMA
GLEN KOPP
KATHRYN MOORE MARTIN
KATIE M. LACHTER
NATHANIEL I. KOLODNY

TELEPHONE
(212) 223-0200

FACSIMILE
(212) 223-1942

BY FEDERAL EXPRESS

March 20, 2007

Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East, Room 659
Brooklyn, NY 11201

Re:   United States v. William Sorin, Dkt. #06 CR 723 (NGG)

Dear Judge Garaufis:

This letter is respectfully submitted on behalf of William Sorin, who is scheduled to be sentenced on March 30, 2007, for conspiracy to violate the securities laws. As detailed below, Mr. Sorin has lived a life blemished only by the matter that brings him before the Court. In 2003, he left the practice of law to devote himself to supporting jazz music and advancing innovative medical technologies. Quietly and without seeking recognition, he has made extraordinary contributions in both fields. See letter of Christopher Anzalone ("very few people have ever so quietly yet so significantly contributed to the maintenance of this unique American art form [jazz] as Bill Sorin"); letter of Dr. Mauro Ferrari ("I am deeply convinced that [Bill's] inner driving force in his work with our [nanotechnology company] is to help those that suffer from cancer"). In other areas as well, his has been a life marked by kindness and generosity. On the unique facts of this case, we believe that a non-guideline sentence is warranted.

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

A. <u>Background</u>

Bill Sorin was born in Manhattan on November 4, 1948, into a middle class family lacking in intimacy. His father was emotionally cold and his mother was withdrawn, often secluding herself in her room.[1] Bill found solace in music, especially jazz. As a teenager, he haunted the bins of record stores and listened to jazz in the clubs on West 52nd Street. In 1966, Bill graduated from Collegiate preparatory school and enrolled at Berkeley. After his freshman year, he transferred to Trinity College, where he excelled academically. In 1970, he was accepted at Harvard Law School and graduated there with honors.

Bill's legal career began in the corporate department of Kelley, Drye & Warren. He found the work deadening and soon switched to a small tax and corporate "boutique," Zimet, Haines, Moss & Friedman, where he developed a diverse corporate practice.[2] In 1980, at the age of 31, Bill made partner. Two years later, he was introduced to Kobi Alexander, who was looking to raise money to start a software company.

---

[1] Bill's father could be abusive to his family. In his letter to the Court, John Sorin recounts this story:

> Our father had the bad habit of being very unkind to our mother. He often made her cry and run to her bathroom for peace and protection. I remember Bill standing in front of his mother in an effort to physically protect her. I remember his telling his father to leave his mother alone or else he would call the police.

Letter of John Sorin. Letters from Bill's family and supporters are set forth as Appendix A to this submission.

[2] Cyntra Berenson, who was the Office Manager at the Zimet firm recalls that Bill was the associate whom the partners "counted on for everything." She also remembers his decency:

> I saw the fair and honorable way Bill treated his daytime Secretary, Michelle.... He had extreme loyalty to her, and respected her need to be home with her husband. Bill never made her feel guilty about not working longer hours. *That is to be respected and admired.*

*Letter of Cyntra Berenson.*

2

Meeting Kobi Alexander changed the course of Bill's life. In 1984, Bill incorporated Comverse Technology, Inc., of which Alexander was a founding partner. The company designs and manufactures special purpose computer systems for information processing applications, including voicemail. It went public in 1986, and two years later, Alexander became CEO. Soon thereafter, Bill opted to leave the Zimet firm to devote more time to Comverse and other "start-up" clients. He began a solo law practice from an office on Manhattan's Upper East Side, where he worked without a secretary. The lion's share of his work was for Comverse and SMARTS, another computer company that the Alexander family started in 1993; he served as General Counsel for both companies.

During the 1990s, Comverse grew from a company teetering on bankruptcy into the dominant firm in its industry. Bill played a central role in the venture capital financings, public offerings, debt issuances, and acquisitions that enabled the company to thrive. He was a strategic advisor as well as corporate lawyer, encouraging Alexander to purchase a company (Boston Technology) that gave Comverse, whose business had primarily been overseas, a foothold in the United States and led to its dramatic success. David Chuchinsky, who joined Comverse in 1986 and became President of its USA operations, writes this about Bill's role:

> We at the executive level of the company always looked up to Bill for his sound judgment. I remember at one time, again when the company was struggling to "make it," somebody joked that "it is too bad we can't put Bill on the balance sheet since if shareholders had only known the caliber of this guy, the value of the company would go up significantly." [T]here was a lot of truth in that comment.

Letter of David Chuchinsky. See also letter of Brian D. Wiltshire, CEO Comverse International ("[i]n every case I observed a highly ethical and expert practitioner"); letter of Frances Rail ("I know that Bill . . . worked tirelessly for Comverse . . . and he has always showed an interest in the

3

people he has worked with"); letter of Steve Kowarsky, Executive Vice President ("Bill's contribution to [Comverse] . . . was immeasurable and absolutely critical").

Until this matter, Bill Sorin has had an unblemished record: in a 30-year legal career, there have been no civil, administrative or disciplinary proceedings against him. (Indeed, he recalls only one traffic infraction, a speeding ticket in 1971.) And the companies that he has advised have been free from SEC or other regulatory problems.

B.    Music and Nanotechnology

Bill was an able lawyer but never loved practicing law. After turning 50, he looked to leave the legal profession and pursue his true passions. Indeed by 2003, three years before the indictment in this case, he had stopped practicing law entirely. In recent years, he has devoted himself to recording jazz music and to investing in and advising nascent nanotechnology companies.

   1.    Music

At age 13, Bill Sorin listened to a recording of Fats Waller playing the piano and fell in love with jazz. By the time he graduated from law school, he owned several thousand albums and had become an amateur jazz historian.

After high school, Bill began studying jazz and classical piano with jazz great Roland Hanna. Bill's piano skills were modest, but Hanna became a mentor and close friend. In 1968, when an aunt died and left Bill $5,000, he decided to produce an album featuring Hanna and renowned saxophonist Coleman Hawkins. The album was never released, but it was the inspiration for Bill's later endeavors.

Those endeavors began in earnest 34 years later in 2002, when Bill offered Hanna the opportunity to return to the studio and record three albums. The performances were recorded at

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

the Performing Arts Center in Purchase, New York, using a top sound engineer and a piano donated by Steinway. The first album was released in 2003 and was one of only four albums that year to receive a 5-star ("masterpiece") rating from <u>DownBeat</u>, a leading jazz magazine. One critic described the album as "a stunningly beautiful solo recording [which] sparkles like a radiant jewel."

Following his work with Hanna, Bill recorded other musicians from the "classic modern jazz" era of the 1950s and 1960s -- artists who were underappreciated or who, like Hanna, had never had the opportunity to make a high-quality recording. In 2004, Bill assembled a band comprised of some of the greatest living jazz musicians of that era, most of them in their 70s, to record the compositions of Tom McIntosh. McIntosh, who was then 76 years old, had been a brilliantly original composer in the 1950s and 1960s, but had never had an album under his own name. Letter of Tom McIntosh ("my meeting with Bill Sorin has resulted in reviving my career in all venues of musical entertainment"). In 2005, using many of the same musicians, Bill produced two albums showcasing compositions of "the magnificent" Thad Jones. (Among the musicians on the albums was Thad Jones' brother, Hank, who at 88 is the dean of living jazz pianists.) The first album was released in 2005 and was called "the perfect jazz recording" by jazz critic Nat Hentoff. The second is due out in early 2007; advance reviews have deemed it "a sonic and historic wonder" and "a worthy candidate for jazz album of the year."

Bill has plans to release numerous other albums on his IPO label. Among them are albums by Roger Kellaway, a pianist who played with some of the leading jazz bands of the early 60s before largely abandoning jazz for other music projects. This past spring, with Bill's support, Kellaway had his first New York club engagement in more than 10 years, which Bill recorded and which a <u>Wall Street Journal</u> critic called a display of "proliferating creativity." Bill has also helped revive the career of Eddie Daniels, who played clarinet and tenor saxophone with "a prodigious

technique" in the late 1970's before "slipping into the margins," in the words of one jazz historian. Most recently, Bill arranged for Hank Jones and 81-year-old saxophonist James Moody, who played with Dizzie Gillespie's band, to record together for the first time. Together, the two men have 130 years of professional experience.

Among the letters attached to this submission are those from people in the music industry who recognize Bill's accomplishments. The letters describe Bill as "a man with a passion for the music he records, an attitude of fairness towards the musicians, and a real aesthetic sense." Letter of Eddie Daniels; see also letter of Roger Kellaway ("I hope to continue recording for him because of his total decency, honesty, generosity, integrity and the feeling that he actually enjoys the music!"); letter of Richard Davis ("[h]is general commitment to music art manages to attract the world's greatest artists"); letter of James Moody ("Bill has taken the time to put several giants in Jazz ... on recordings so that their music would not be gone forever"); letter of Stephanie Myers ("Bill has a genuine desire to make sure that the great jazz artists of this generation are recorded so that future generations will have the pleasure of this beautiful music").

As these letters make plain, Bill has not been motivated by the hope of commercial success. He has invested his time and money in these projects because of his love of jazz, his respect for the musicians who perform it, and his desire to preserve a uniquely American art form for future generations. In all, he has spent more than $300,000 to produce recordings of historic importance. See letter of Tim Martyn ("I am certain that virtually every one of these projects was produced at a financial loss on Bill's part, simply for the love of musical art and the dedication he so obviously felt to the performers").

6

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

2. <u>Nanotechnology</u>

Bill developed an abiding interest in nanotechnology after first reading about it in a science journal several years ago. Nanoscale devices are one hundred to ten thousand times smaller than human cells and therefore have the potential to detect disease and deliver treatment in ways previously unimagined. Here, too, Bill's interest has not been to enrich himself, but rather to promote better treatments for cancer and diabetes -- to "help his fellow citizen who suffers." Letter of Mauro Ferrari.

In 2005, Bill was introduced to Dr. Mauro Ferrari, formerly the special advisor to the National Cancer Institute on nanotechnology, and they discussed the creation of a new company to apply nanotechnology to cancer treatment. (Bill's mother had died of cancer, two months after he was married.) Bill became the principal investor in Dr. Ferrari's start-up company, Leonardo Biosystems, which is now focusing on new treatments for breast and ovarian cancer. Christopher Anzalone, the CEO of Leonardo Biosystems, writes this about Bill's role in the company:

> Bill was the first investor in a company that, at that time, had no intellectual property, no assets, no distinct business strategy, and no management team. He invested in Mauro Ferrari's passion and intellect, and with a sense that someone needed to help make this vision of using nanotechnology to treat cancer a reality.... Bill is [also] a strong ethical force within Leonardo Biosystems without ever being explicit; it is simply part of his nature. He is a leader in the company and has instilled in our corporate culture a strong sense of that which is right.... We would be a poorer company indeed without him.

Letter of Christopher Anzalone.[3]

---

[3] Dr. Ferrari's letter is to the same effect:

> I have been working with Bill for well over a year now, setting up a new company ... dedicated to finding new cures against cancer. We have worked very closely in this endeavor, with weekly strategy and operation sessions. We have engaged in a multitude of discussions, and reached many decisions together on the best course to follow, in

7

Bill has also been instrumental in the growth of Smartcells, Inc., a company founded by MIT doctorate Todd Zion, which seeks to use nanotechnology to administer insulin in the treatment of diabetes. By maintaining constant control of blood glucose levels, Smart Insulin (as the company's product is called) is designed to address the serious long-term problems associated with diabetes, including kidney and circulatory disease and blindness. The product would also reduce the pain and inconvenience of frequent blood-glucose testing and eliminate the risk of potentially fatal hypoglycemic shock from insulin injections. (An estimated 20 million Americans suffer from diabetes, which consumes one out of every 10 health care dollars spent in the United States.) In addition to providing start-up funding for Dr. Zion's company, Bill has been a key strategic advisor for Smartcells, much as he was for Comverse. He conceived a plan to establish a separate company to create a comparable product for the veterinary market. (An estimated 1.5 million companion animals suffer from diabetes.) The new company, which Bill has funded, is developing a nano product for animals that will provide a source of revenue for Smartcells' research on products for humans, and also accelerate testing for FDA approvals for human use.[4]

---

> terms of financial decisions, research strategy, sectors of oncology to target, partnerships, and many more. What is most striking to me, and speaks volumes about his ethical convictions, is that never once in all of these engagements was he driven by anything other than making the best decision to benefit the most cancer patients, as much as possible. I am deeply convinced that his inner driving force in his work with Leonardo is to help those that suffer from cancer. It is nothing else -- his primary driver is to help his fellow citizen who suffers.

Letter of Mauro Ferrari.

[4] Bill has also been a seed investor in another nanotech company that uses technology created at MIT to make bioactive synthetic bone products for treatment of osteoporosis and orthopedic and spinal injuries.

8

Bill's interest in diabetes research was influenced, in part, by the fact that two of his nieces, Rebecca Wassman and Hannah Hall, suffer from the disease. See letter of Rebecca Wassman ("Uncle Bill's company means so much to me because I am a juvenile diabetic, and have been for twelve years"); letter of Debra Kelley ("[m]y brother-in-law Bill Sorin's work to find a cure for diabetes might help save my daughter Hannah"); letter of Todd Zion ("[Bill] told me that his most important reason for supporting the company was . . . the chance to make a huge positive impact on society"). In all, Bill has invested more than $1 million in nanotechnology, which he believes holds extraordinary promise for combating major health problems.

C.  Family

Bill's passion for music and his interest in nanotechnology are secondary to his dedication to his family. In 1983, while he was still a law firm partner, Bill met Anne Hall, a clothing designer, who was working for Geoffrey Beene. They have been married for 21 years, and have a daughter, Kay, who is 16 years old. Bill has encouraged Anne's second career in interior design. (Her work was recently published in Oprah Winfrey's new magazine, O at Home.) Above all, however, Bill has been a devoted father. In her letter to the Court, Anne Sorin describes Bill's parenting:

> [Bill] grew up with a cold, abusive father and a passive, subservient mother. As a result, he had no road map to follow in creating positive family experiences. . . . Reading children's books [with Kay] changed everything. . . . I witnessed my shy, quiet husband grow to enjoy the drama of reading aloud. He read so theatrically that, over time, Kay insisted that her Dad be the reader every night. As Kay learned to love books, Bill learned how to be a father, and they both learned how much they adored each other . . . . To this day, my husband and daughter share a love of words, language, and literature. . . . He is her father, her intellectual mentor, and most of all, her best friend.

Letter of Ann Sorin.

9

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

Kay is an A-student at Nightingale-Bamford School, where she has won awards for excellence in English and History. Her letter to the Court speaks movingly about her relationship with her father:

> My father's always been here for me. . . . How could I ever have wanted anything more? My father is a part of my life. Everyday. What is more important than his knowledge and absolute brilliance, is his willingness to take the time to help me learn. Just last month he stayed up 'till one in the morning, quizzing me on fifty-four opera arias and concertos. . . . He may complain and tease me, but when it comes down to it, if I need him I know he will always be there for me, no matter the hour, the difficulty, or the amount.

Letter of Katherine Grace Sorin.

Numerous other letters comment on Bill's special relationship with Kay. Letter of Debra Kelley ("Bill and . . . Kay are like two peas in a pod [;] [h]e has instilled in her his passion for history, literature and music"); letter of Kathryn Treny ("[t]oday Kay is an excellent student, an avid reader and a history nut . . . and I can't help but think that special time he has always set aside for her [explains] her current achievements"); letter of Lisa Fine ("Bill's devotion and talent for teaching will continue to guide and influence Kay for the rest of her life").

Bill and his family are also active members of All Souls Unitarian Church in Manhattan. See letter of Rev. Galen Guengerich ("Bill and Anne have consistently been among the most generous supporters of our congregation, both in financial terms and in contributions of time and energy").

D.  *General Character*

The letters to the Court paint a picture of Bill as a man of "uncommon gentleness and native kindness." Letter of John R. Reinus; see also letter of Anne Wilson Hall ("[h]e is quiet and gentle and totally nonjudgmental"); letter of Michele Berezowsky ("[i]n spite of Bill's imposing presence, I remember being struck by his gentle and respectful demeanor"); letter of Marilyn Fezza

10

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

(Bill is "an intensely private person [with the] nature of a true gentleman"); letter of Ivan Kustura (Bill is "always kind and considerate, a gentle soul"); letter of Steve Kowarsky ("Bill's gentle quality goes deeper than the tone of his voice; there is a kindness in his way, a basic respect for each person he encounters"). To borrow the words of his godson: Bill has a "quiet manner and a quality of heart" that enriches those who come to know him.

The letters are also replete with stories of Bill's taking time to care for others. Steve Goss, for example, tells of how Bill (whom Mr. Goss had not seen for 15 years) helped him after Hurricane Katrina left him destitute:

> [K]nowing I had little in the way of clothing, particularly for job interviews, Bill went into his closet and gave me almost a dozen sports jackets ... from his younger days, even offering to have them tailored down to fit me (he is considerably taller than me). Sweaters, scarves and gloves were thrown in for the approaching fall weather. Money was offered, without my having to ask, and no talk of repayment. ... Bill gave me one of his brand new laptop computers and a Treo Cell phone with a Cingular account billed to him. ... Needless to say I was floored by Bill's generosity, especially considering how worried I was that he might judge me harshly for arriving in such a predicament at my age (not young) with absolutely no resources.

Letter of Steve Goss.

Other letters sound the same theme. See, e.g., letter of Liz Lee (when "[m]y ex-husband died suddenly ... at the age of 52[,] Bill became extremely important as a guide in managing my son, Tad"); letter of Tad Fabiaschi ("[w]ithout Bill's guidance and his ubiquitous presence throughout my childhood, I wouldn't be half the man I am today"); letter of Santo Castillo, tennis pro ("I had not been able to afford to visit my family in the Dominican republic for over eight years [and Bill] kindly gave me $500 to buy plane tickets for the trip"); letter of Wendy Everett Cooke ("[w]ithout [his] generosity ... I would not have become the artist or the happy person I am today"); letter of Wendy Wassman ("Bill gave the money to allow us to move to Florida so our

11

daughter could accept a high school scholarship at an excellent private school"). As his wife Anne writes: "[i]n the world of Bill Sorin, 'do unto others as you would have them do unto you' is always present."

E.  Offense Conduct

Bill Sorin faces sentencing for criminal conduct that is at odds with the way in which he has conducted himself throughout his professional and personal life. His plea allocution summarizes what occurred:

> Sometime in the late 1990's, Mr. Alexander told me that he had selected an exercise price for Comverse options that was equal to the lowest price at which Comverse shares had traded in the past quarter. I knew what he was doing was wrong and did not challenge his conduct or share my knowledge with the Board of Directors and auditors of the company.
>
> In the years after that conversation and into 2002, the company prepared and I approved proxy statements and SEC filings which falsely reported that Comverse options were issued with an exercise price at the fair market value of the stock on the grant date, when, in fact, Comverse was issuing backdated options with an exercise price lower than the fair market value on the date of the grant, and which therefore should have been accounted for as compensation to its employees.

Two points implicit in that statement deserve emphasis. First, Mr. Sorin did not conceive of the plan to backdate option prices, nor did he participate in the selection of grant dates, prices or recipients. The architect was Alexander. Indeed, Mr. Sorin recalls only the one conversation with Alexander about option pricing referred to above; he never participated in a meeting on the subject. Mr. Sorin's error was not to challenge Alexander and thereafter to prepare consent forms and approve SEC filings as if nothing was wrong. Second, as the government will acknowledge, Mr. Sorin had no role in the Phantom options slush fund, which Alexander and David

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

Kreinberg, Comverse's CFO, created to park options and evade Comverse's options plan.[5] Tellingly, it appears that Alexander and Kreinberg may have kept Mr. Sorin from knowing about the slush fund for fear that he would not tolerate its existence.[6]

That is the tragic irony of this case. The Phantom/Fargo slush fund made the Comverse case an especially attractive one for prosecution, yet Mr. Sorin had no role in it. As the Court is undoubtedly aware, backdating options was wide-spread in the 1990s, so much so that economists have estimated that more than 2,000 firms may have engaged in the practice. See Heron and Lie, "What Fraction of Stock Option Grants to Top Executives Have Been Backdated or Manipulated, Working Paper"(estimating "that 30.1% [of firms for which data was available] engaged in backdating at some point between 1996 and August 28, 2002," when the SEC tightened reporting requirements). Although it does not excuse his wrongful conduct, the reality is that Mr.

---

[5] The complaint describes the slush fund this way:

> The details of this aspect of the fraud include the following. In or about October 1999, ALEXANDER and KREINBERG instructed the Assistant to create a secret account in which to park options, to be available for ALEXANDER and KREINBERG to dole out to employees, as ALEXANDER saw fit, for recruitment and retention purposes. The Assistant created the secret account, as instructed, and initially named it "I.M. Fanton" [sic], a derivation of "Phantom," later changing the name to "Fargo" (the "Phantom/Fargo account"). At various times, ALEXANDER or KREINBERG instructed the Assistant to manufacture options to be parked in the Phantom/Fargo account.... The purpose of this maneuver was to deceive the Compensation Committee into awarding grants to nonexistent persons, in small amounts that would not attract the Committee's attention.

Complaint ¶¶ 43-44 (footnotes omitted)(emphasis in original).

[6] The randomness of prosecutions in this area is evidenced by the state charges recently brought against Ryan Brant, the CEO of Take-Two Interactive Software, Inc. Mr. Brent, who orchestrated a backdating scheme at his company, pleaded guilty to a class-E felony for Falsifying Business Records and was promised a probation sentence. He has agreed to cooperate against those whom he directed. See Wall Street Journal 2/15/2007 at A4.

13

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

Sorin will be one of the few executives prosecuted for the crime -- a prosecution spurred on by a secret slush fund about which he was kept in the dark.[7]

Moreover, as the government will confirm, Mr. Sorin was quick to admit his wrongdoing and accept responsibility for his crime. Even before the criminal complaint was filed, his attorney contacted the United States Attorney's Office and expressed Mr. Sorin's willingness to plead guilty. Mr. Sorin's role in the offense was limited, but his contrition is not. At a time when Alexander, who orchestrated the back-dating scheme, is living rich in Africa, Mr. Sorin is in New York City awaiting sentencing in this matter.

F.   <u>Guideline Calculation</u>

The Pre-Sentence Report ("PSR") estimates the "loss" at more than $50 million. PSR ¶ 128. This figure is calculated by "multiplying the discounts received due to the back-dated options by the number of back-dated options actually exercised at the various discounts." <u>Id.</u> As discussed below, this methodology is not free from problems.[8]

1.   The PSR loss figure is so high because Comverse stock performed well in the years immediately after the 1998 and 1999 annual grants were backdated. An example demonstrates the point: assume (i) that a company's stock is selling at $50 on June 1, 1998; (ii) that it was selling at $40 on April 1, two months earlier; and (iii) that on June 1, 5 million options are granted to employees and backdated to April 1, so that the exercise price is $40. Typically,

---

[7]   Mr. Sorin has settled with the SEC. The settlement requires him to pay $1,670,915.00 in "disgorgement" (of which $1,007,201.58 represents "in-the-money" benefit from exercises of backdated options), $817,509.07 in prejudgment interest, and a $600,000 civil penalty, for a total of $3,088,424.10. The disgorgement was based on stock options that he received as part of annual, company-wide grants.

[8]   Under the Plea Agreement, Mr. Sorin has agreed that "the applicable adjusted offense level ... yields a range of imprisonment that exceeds 60 months." Plea Agreement ¶ 2. Nothing in this section is intended to suggest a lower range.

14

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

employee options cannot be exercised immediately, and the vesting period is often as long as five years. If the company's stock were to plummet after 1998 because of market forces (e.g., the "tech bubble" bursts), the options would not be exercised, and the loss (using the PSR's methodology) would be zero. On the other hand, if the company's stock were to rise after 1998 because of market forces (e.g., the company develops a new product), the loss would be large. In our example, were the company to flourish and were all the options exercised, the PSR methodology would yield a $50 million loss -- $10 (the discount received) x 5 million (the number of options exercised). A loss measure that is so sensitive to a company's market performance (and one that increases if the company performs better) is surely open to question. See United States v. Ebbers, 458, F.3d 110, 128 (2d Cir. 2006)("[l]osses from causes other than the fraud must be excluded from the loss calculation").[9]

  2. The government candidly acknowledges that "computing the loss amount based on the amount the stock price suffered as a result of the fraud was too complex and subject to numerous potential errors." PSR ¶ 128. That is surely true.[10] Most companies that have significant back-dating problems have not experienced sharp price declines since the issue was discovered. Perhaps the best example is Apple, whose stock price has been unaffected by revelations of back-dating, in large measure because its CEO has retained his position.

---

[9] From conversations with the government, we are aware that it considered other formulae (including an intended loss calculation), some of which could yield a higher loss figure. Our point here is simply that determining loss in a back-dated options case is a difficult task and that loss should not be the dominant factor in fixing Mr. Sorin's sentence.

[10] See "Option Fines, A Hard Call," Wall Street Journal 3/8/07, C1 ("[t]he Securities and Exchange Commission is struggling to answer what it says is a surprisingly tough question: How much were companies and their shareholders hurt when executives' stock options were backdated?"). (Appendix B contains the materials about option pricing that are referred to in this section.)

15

As one leading consulting firm has concluded, "[g]eneralized conclusions about the economic effects of backdating practices on company shareholders are hard to draw."[11] There are two principal reasons that this is so. First, although the timing of option grants was hidden from investors, the strike price and other terms were fully disclosed in public filings, as was the stock-option expense under the so-called Black-Scholes methodology.[12] Indeed, since 1995, the Financial Accounting Standards Board has required such disclosures. As Professor Larry Ribstein has observed, given these disclosures, "there is no indication that backdating itself fooled the market."[13] Second and related, analysts invariably value companies using "pro-forma" measures that exclude items, including stock-based compensation, that do not effect economic fundamentals. It is therefore not surprising that one experienced analyst has observed that "professional investment analysts uniformly consider stock-option compensation expenses irrelevant to the valuation of publicly traded securities."[14] That fact distinguishes this case from other accounting fraud prosecutions that have garnered headlines in recent years.[15]

G.   Conclusion

This Court is well aware of the factors set forth in 18 U.S.C. § 3553(a), which must be considered in setting a defendant's sentence. See United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Especially after Booker, a sentencing judge is not imprisoned like "a robot inside a

---

[11]   See NERA, "Options Backdating: Accounting, Tax and Economics," at 1 (Appendix B).

[12]   The Black-Scholes methodology (named for the two Nobel prize winning economists who developed it) is discussed in the NERA article. See supra n.10.

[13]   Ribstein, University of Illinois College of Law, www.ideoblog.org., Dec. 22, 2006 (Appendix B).

[14]   Declaration of Christopher J. Crespi in SEC v. Reyes (Appendix B).

[15]   It bears note that the government has seized $48 million from Alexander and that Mr. Sorin has paid more than $3 million in his SEC settlement. Thus, with respect to the loss attributable to the back-dated options, this is the unusual securities fraud case in which the shareholders may be made whole.

16

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

Guidelines glass bubble." <u>United States v. Lara</u>, 905 F.2d 599, 604 (2d Cir. 1990). We have written at such length about Bill Sorin because he is an extraordinary man. Other than the conduct in this case, he has led a truly estimable life: he has practiced law with distinction; supported his church; devoted himself in recent years to advancing the careers of venerable jazz musicians; invested heavily (both his money <u>and</u> time) in nanotechnology to improve treatments for debilitating illnesses; devoted himself to his marriage; and inspired a daughter to love learning.

We recognize, as does Mr. Sorin, that any securities fraud is a serious crime. The fact that backdating options had become a common practice in corporate America hardly makes it a lawful one. In this case, however, given Mr. Sorin's limited role in the scheme, the loss (however calculated) is not a fair measure of his culpability. *As one court has trenchantly observed:*

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large [frauds] damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for ... fraud place excessive weight on this single factor, attempting -- no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes -- to assign precise weights to the theft of different dollar amounts. In many cases, ... the amount ... is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.

<u>United States v. Emmenegger</u>, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)(Lynch, J.).

For all these reasons, we respectfully submit that an incarcerative sentence is not necessary to serve the purposes of Section 3553(a).[16] House arrest, community service, a stiff fine are all alternatives that would not diminish respect for the law, but would allow Mr. Sorin to

---

[16] The so-called "parsimony provision" of Section 3553(a) requires that sentences be only as long as necessary to serve the purpose listed in Section 3553(a)(2). <u>See</u> <u>United States v. Williams</u>, 475 F.3d 468, 476 (2d Cir. 2007)("district courts are to impose sentences pursuant to the requirements of § 3553(a) -- including the requirements of § 3553(a)'s parsimony clause").

17

LAW OFFICES
STILLMAN, FRIEDMAN & SHECHTMAN, P.C.

continue to live a productive life. If allowed to remain in the community, Bill Sorin will produce more "masterpiece" albums and promote more fledging bio-science firms. And he will be able to guide his daughter in her last two years of high school. Through our representation, we have come to know Bill Sorin well and to admire him greatly despite his crime. We have no doubt that he will live a law-abiding and worthy life in future years.

Respectfully submitted,

*Paul Shechtman*
Paul Shechtman
Stillman, Friedman & Shechtman, P.C.

*James L. Brochin*
James L. Brochin
Paul, Weiss, Rifkind, Wharton &
Garrison LLP

PS/JLB:wr
Enclosures
cc:    AUSA Ilene Jaroslaw (by federal express, w/encls.)